United States District Court
Southern District of Texas

**ENTERED**

September 17, 2021

Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

SHAWN LEE WILLIAMS,             §
TDCJ #779559,                   §
                                §
            Plaintiff,          §
                                §
v.                              §       CIVIL ACTION NO. H-20-0853
                                §
SERGEANT GREGORY CARTER,        §
                                §
            Defendant.          §

<u>MEMORANDUM OPINION AND ORDER</u>

State inmate Shawn Lee Williams (TDCJ #779559) has filed a Prisoner's Civil Rights Complaint under 42 U.S.C. § 1983 ("Complaint") (Docket Entry No. 1), alleging that "Sergeant Carter" used excessive force after Williams was found in possession of a cellular telephone while confined in the Texas Department of Criminal Justice - Correctional Institutions Division ("TDCJ"). At the court's request Williams has submitted Plaintiff's More Definite Statement ("Plaintiff's MDS") (Docket Entry No. 7), which provides additional details about his claim. The defendant, Sergeant Gregory Carter, has filed Defendant['s] Motion for Summary Judgment ("Defendant's MSJ") (Docket Entry No. 28). Williams has replied with Plaintiff's Motion for Summary Judg[]ment ("Plaintiff's MSJ") (Docket Entry No. 37), and Sergeant Carter has filed Defendant's Response to Plaintiff's Motion for Summary

Judgment ("Defendant's Response") (Docket Entry No. 38). Williams has filed several other motions, including three Motions for Appointment of Counsel (Docket Entry Nos. 32, 36, 39), a Motion for Jury Demand (Docket Entry No. 40), and a Motion to Produce Complete Video Record under Rule 34 of the Federal Rules of Civil Procedure (Docket Entry No. 42). After considering all of the pleadings, exhibits, and the applicable law, the court denies all of Williams's motions and grants Defendant's MSJ for the reasons set forth below.

## I.  Background

Williams has been incarcerated in TDCJ since 1997, following his conviction for capital murder.[1] On the evening of January 8, 2019, Sergeant Carter and another correctional officer (Officer Victoria Price) entered Williams's cell at the Estelle Unit.[2] According to Williams, Sergeant Carter turned on the lights and ordered him to submit to a strip search when Carter "became aware of [a] cell phone" in Williams's cell.[3] Williams acknowledges that he "ignored" Sergeant Carter's order to surrender the cell phone.[4]

---

[1]Plaintiff's MDS, Docket Entry No. 7, pp. 1, 6. For purposes of identification, all page numbers refer to the pagination imprinted by the court's electronic filing system, CM/ECF.

[2]Complaint, Docket Entry No. 1, p. 4; Plaintiff's MDS, Docket Entry No. 7, p. 1.

[3]Id.

[4]Complaint, Docket Entry No. 1, p. 4.

Williams explains that he disregarded the order because he was told by the inmate who gave it to him to "master clean" or erase data from the phone if he were ever caught with it.[5]

At some point after Williams's initial refusal to comply Sergeant Carter issued a call for assistance from other officers, and it further appears that he requested a video camera to document the confrontation.[6]  While Williams was in the act of erasing data from the phone, Sergeant Carter gave a second order to turn it over.[7]  Williams said "OK," but he did not comply because he was "still trying to set the clean on the phone."[8]  At this time, Officer Price also instructed Williams to surrender the phone, saying "just give it to him."[9]  When Williams did not promptly comply, he claims that Sergeant Carter reacted by pinning him to the wall and striking him repeatedly in the right eye, giving him "7 or 8 licks," before spraying him "directly in the eyes" with a chemical agent.[10]  Williams then fled from his cell onto the run,

_____

[5]Plaintiff's MDS, Docket Entry No. 7, p. 1.  Williams explains further that he was "holding" the phone as a means of paying off a "debt" that he owed another prisoner.  Id. at 2.  Williams states that he is now "further in debt" because he was caught with the phone.  Id.

[6]Complaint, Docket Entry No. 1, p. 4; Plaintiff's MDS, Docket Entry No. 7, p. 2.

[7]Plaintiff's MDS, Docket Entry No. 7, p 1.

[8]Id.

[9]Id.

[10]Id.

where he was subdued by other officers who responded to Sergeant Carter's earlier call for assistance.[11]

Sergeant Carter explains that possessing a cell phone in a correctional facility is strictly prohibited because it is a threat to security and a felony offense under Texas law.[12]  During the administrative investigation of the use of force, Sergeant Carter stated that he entered Williams's cell to conduct a strip search because there was suspicion that Williams had contraband.[13] Sergeant Carter called for additional staff after Williams refused to submit to a strip search.[14]  While waiting for additional officers to respond, Sergeant Carter observed that Williams had a "black cellular device."[15]  When Sergeant Carter reached for the item, Williams "became aggressive," clenching his fist and making

---

[11]Complaint, Docket Entry No. 1, p. 4; Plaintiff's MDS, Docket Entry No. 7, p. 2.

[12]Defendant's MSJ, Docket Entry No. 28, pp. 2, 9.  It is a third-degree felony offense under Texas law to possess "a cellular telephone or other wireless communications device or a component of one of those devices" while confined in a correctional facility. See Tex. Penal Code § 38.11(j); see also 18 U.S.C. § 1791(d)(1)(F) (making it unlawful to possess contraband, including a "phone or other device used by a user of commercial mobile service," while imprisoned in a federal correctional institution or detention facility).

[13]TDCJ Use of Force Report No. M-00214-01-19 ("Use of Force Report"), Exhibit C to Defendant's MSJ, Docket Entry No. 28-3, p. 12.

[14]Id.

[15]Id.

a motion towards him.[16]  Officer Price also observed Williams become aggressive when Sergeant Carter reached for the cell phone and saw Williams "motion his fist" towards Carter.[17]  Sergeant Carter "then used one closed fist" to strike Williams in the "mid facial region."[18]

According to Sergeant Carter and Officer Price, Williams continued to behave aggressively and resist their efforts to recover the phone.[19]  Sergeant Carter gave Williams additional orders to stop resisting or chemical agents would be dispersed.[20] After Williams disobeyed these warnings, Sergeant Carter administered 3.5 ounces of chemical agent.[21]  Officer Price, who had "initiated the Incident Command System" to alert other officers of the altercation, secured Williams's legs and placed him on the floor as he continued to resist.[22]  Several other officers, including Sergeant Solomon Odoi, Sergeant Justine Ateka, Officer David Oladimeji, and Officer Simone Powell, responded to the call for help and observed Williams, who had hidden the cell phone in

---

[16]Id.

[17]Id. at 21.

[18]Id. at 12.

[19]Id. at 12, 21.

[20]Id. at 12.

[21]Id. at 12, 21-22.

[22]Id. at 22.

his pants, actively resisting Sergeant Carter and Officer Price.[23]
After the officers secured Williams with hand and leg restraints,
the cell phone fell to the ground and was recovered by Officer
Price.[24]  Williams was placed on a gurney and taken to restricted
housing on A-wing, where his restraints were removed.[25]  A nurse
examined Williams and noted "no injuries."[26]

Medical records show that Williams was escorted to the
infirmary on January 9, 2019, which was the morning after the use
of force occurred.[27]  Williams's right eye had "periorbital edema
and ecchymosis, with a solid scleral redness."[28]  Williams reported
seeing a "blurry haze over the eye," and a "sharp throbbing pain,"
rated a six on a scale of zero to ten.[29]  Williams also complained
of pain in his right shoulder.[30]  A physician authorized Williams's
transfer to an outside hospital on a non-emergency basis to

---

[23]Id. at 15, 17, 24, 26 (Statements of Sergeant Solomon Odoi,
Sergeant Justine Ateka, Officer David Oladimeji, and Officer Simone
Powell).

[24]Id. at 12-13, 22.

[25]Id. at 15, 17, 27, 29.

[26]Id. at 27, 29.

[27]Correctional Managed Health Care ("CMHC") Urgent/Emergent
Care Record, Exhibit B to Defendant's MSJ, Docket Entry No. 28-2,
p. 35.

[28]Id.

[29]Id.

[30]Id.

evaluate the trauma to his eye and his complaints of shoulder pain.[31]

Williams was evaluated at CHI St. Joseph Health Regional Hospital in Bryan ("St. Joseph's Hospital),[32] where he reported "being hit to the right eye with a fist" and injury to his right shoulder.[33]  A CT scan of Williams's head and maxillofacial area disclosed "right infraorbital superficial soft tissue swelling" attributed to a "traumatic soft tissue contusion," but no fracture to the eye socket and no "intracranial hemorrhage" or brain injury.[34]  A radiograph of Williams's right shoulder disclosed no fracture or dislocation.[35]  The treating physician discharged Williams to return to the Estelle Unit the same day with a diagnosis of a "right periorbital hematoma," otherwise known as a black eye, and "subconjunctival hemorrhage," which refers to "broken blood vessels in the white portion of the eye."[36]  Williams was treated with an over-the-counter pain medication (Tylenol) and

_____

[31]Id. at 34, 36.

[32]St. Joseph's Hospital Admission/Registration Record, Exhibit B to Defendant's MSJ, Docket Entry No. 28-2, p. 99.

[33]St. Joseph's Hospital Emergency Record, Exhibit B to Defendant's MSJ, Docket Entry No. 28-2, p. 109.

[34]CAT Scan Reports, Exhibit B to Defendant's MSJ, Docket Entry No. 28-2, pp. 100-02.

[35]Imaging Services Report, Exhibit B to Defendant's MSJ, Docket Entry No. 28-2, p. 104.

[36]St. Joseph's Hospital Emergency Record, Exhibit B to Defendant's MSJ, Docket Entry No. 28-2, pp. 109, 110, 113, 115.

eye drops (proparacaine).[37] The physician recommended that Williams follow-up with his primary care provider and an ophthalmologist.[38]

During a follow-up appointment at the Estelle Unit infirmary on January 14, 2019, a physician noted that Williams had "residual" swelling of the periorbital area and "diffuse" subconjunctival redness in his right eye with visual acuity of 20/200.[39]  Because Williams reported having diminished vision, the physician referred Williams to a specialist at the John Sealy Hospital in Galveston to rule out a detached retina.[40]

That same day Williams filed a Step 1 Grievance, alleging that Sergeant Carter hit him in his right eye "twice" before striking him three more times during the altercation that occurred on January 8, 2019.[41]  During an interview with a grievance investigator on January 16, 2019, Williams claimed that he could not see out of his right eye due to the swelling around it, but the officer who conducted the interview observed that there was "no swelling present" at that time.[42]

---

[37]Id. at 107, 111.

[38]Id. at 107, 110, 112.

[39]CMHC Clinic Notes, Exhibit B to Defendant's MSJ, Docket Entry No. 28-2, pp. 47-48; CMHC Visual Acuity Test, Exhibit B to Defendant's MSJ, Docket Entry No. 28-2, pp. 88-89.

[40]CMHC Clinic Notes, Exhibit B to Defendant's MSJ, Docket Entry No. 28-2, p. 48.

[41]Step 1 Grievance #2019064664, Exhibit A to Defendant's MSJ, Docket Entry No. 28-1, p. 5.

[42]Inter-Office Communications, dated January 16, 2019, Exhibit A to Defendant's MSJ, Docket Entry No 28-1, p. 13.

On January 25, 2019, Williams was evaluated by an ophthalmologist at the John Sealy Hospital.[43]  Williams reported having "fuzzy" vision and "constant right eye pain (4-5/10 in severity)" because he was "hit 7 times by a fist in his right eye."[44]  The specialist evaluated Williams for signs of eye trauma and a detached retina with "possible blood 'behind the eye.'"[45]  The specialist observed that Williams had a "resolving subconjunctival hemorrhage" with 20/60 vision in his right eye, but found "no apparent organic cause for decreased vision[.]"[46]  The specialist concluded that "no acute ophthalmological intervention" was warranted and recommended a follow-up appointment for another visual acuity check in the "General Ophthalmology clinic" in four to six weeks.[47]

Williams had a follow-up appointment at the John Sealy Hospital on February 28, 2019, where the specialist noted improvement with 20/40 vision in the right eye.[48]  The specialist recommended following up with the "general clinic" in four months,

---

[43]CMHC Return from Medical Appointment, Exhibit B to Defendant's MSJ, Docket Entry No. 28-2, pp. 80-82.

[44]Id. at 81.

[45]Id.

[46]Id.

[47]Id. at 82.

[48]CMHC Return from Medical Appointment, Exhibit B to Defendant's MSJ, Docket Entry No. 28-2, p. 75.

but he did not prescribe any treatment.[49]   Williams does not indicate that he required further treatment for the black eye that he sustained on January 8, 2019,[50] and the available medical records do not reflect that he requested any.[51]

As a result of the incident that occurred on January 8, 2019, Williams was charged with violating prison disciplinary rules by committing a felony, namely possessing a cell phone while incarcerated in a correctional facility in violation of § 38.11 of the Texas Penal Code.[52]   Williams was found guilty of the offense following a disciplinary hearing.[53]   As punishment, Williams was restricted to his cell without commissary and other privileges for 30 days.[54]   He was also reduced in classification status from S3 to

---

[49]Id.

[50]Plaintiff's MDS, Docket Entry No. 7, p. 3, response to question 10 (indicating that his sight returned and he did not require any further treatment beyond the initial consultation and follow-up visit with the specialist at the John Sealy Hospital in Galveston).

[51]Affidavit of Records Custodian Lisa Lopez, Exhibit B to Defendant's MSJ, Docket Entry No. 28-2, p. 2 (providing medical records for the plaintiff for the time period of January 1, 2019, through June 30, 2019).

[52]TDCJ Offense Report - Case No. 20190113490, Exhibit E to Defendant's MSJ, Docket Entry No. 28-5, p. 4.

[53]TDCJ Disciplinary Report and Hearing Record - Case No. 20190113490, Exhibit E to Defendant's MSJ, Docket Entry No. 28-5, p. 3.

[54]Id.

-10-

L1, and he forfeited 180 days of previously earned good-time credit.[55]

Invoking 42 U.S.C. § 1983, Williams sues Sergeant Carter for using excessive force by striking him in the eye on January 8, 2019.[56]   Williams seeks compensatory damages for the violation of his rights under the Eighth Amendment.[57]   Sergeant Carter moves for summary judgment, arguing that he is entitled to official and qualified immunity from Williams's claims.[58]   Williams moves for summary judgment on his own behalf, arguing that Sergeant Carter violated his clearly established constitutional rights by failing to follow prison procedures governing the use of force, and he has filed a written demand for a jury trial.[59]   Williams has filed several other motions, requesting appointment of counsel and

---

[55]Id.

[56]Complaint, Docket Entry No. 1, p. 4.

[57]Id.   Williams alleges further that the officers who subdued him on January 8, 2019, committed a violation of the Prison Rape Elimination Act ("PREA"), 42 U.S.C. § 15601 et seq., because he was "stripped of his boxers for all to witness" during the altercation. Plaintiff's MSJ, Docket Entry No. 37, p. 7. His allegations do not demonstrate that a violation occurred, and PREA does not otherwise afford a private cause of action for prisoners.   See Krieg v. Steele, 599 F. App'x 231, 232 (5th Cir. 2015) ("[C]ourts addressing this issue have found that the PREA does not establish a private cause of action for allegations of prison rape.") (collecting cases).

[58]Defendant's MSJ, Docket Entry No. 28, pp. 3-14.

[59]Plaintiff's MSJ, Docket Entry No. 37; Motion for a Jury Demand, Docket Entry No. 40 (invoking Rule 38 of the Federal Rules of Civil Procedure and the right to a jury trial guaranteed by the Seventh Amendment).

discovery.[60] The parties' motions are examined below under the governing standards of review.

## II. Motions for Appointment of Counsel

Williams has filed three motions for appointment of counsel, asserting that he is indigent and that he has been unsuccessful in his efforts to find a lawyer to take his case.[61] There is no automatic constitutional right to appointment of counsel in civil rights cases. See Baranowski v. Hart, 486 F.3d 112, 126 (5th Cir. 2007); Ulmer v. Chancellor, 691 F.2d 209, 212 (5th Cir. 1982). A court is not required to locate counsel for an indigent litigant unless a case presents exceptional circumstances. See Naranjo v. Thompson, 809 F.3d 793, 803 (5th Cir. 2015). In making that determination, the court considers the case's type and complexity, the litigant's ability to investigate and present his case, and the level of skill required to present the evidence. See Baranowski, 486 F.3d at 126; see also Naranjo, 809 F.3d at 799 (listing several other factors).

This case, which involves a claim of excessive force against one defendant, is not factually or legally complex. It is further evident that Williams's claim depends on events for which he was

---

[60]Motion to Produce Complete Video Record, Docket Entry No. 42.

[61]Motion for Appointment of Counsel, Docket Entry No. 32, pp. 1-2; Motion for the Appointment of Counsel, Docket Entry No. 36, pp. 1-2; Motion for the Appointment of Counsel, Docket Entry No. 39.

-12-

present and about which he has personal knowledge. There is no indication in the record that he has been unable to investigate and present his best case. The defendant has provided Williams with discovery and supplemental disclosures under Rule 26(a)(1) of the Federal Rules of Civil Procedure.[62]  In addition, Williams has been provided with exhibits attached to Defendant's MSJ, including grievance records, medical records, the TDCJ Use of Force Report, Emergency Action Center records, and disciplinary records related to the incident outlined in his Complaint.[63]

The record reflects that Williams has done a capable job representing himself thus far with the information and resources that are available to him. Williams provided a detailed response to the court's Order for More Definite Statement.[64]  He has also filed several motions on his own behalf, including a motion for summary judgment that applies the relevant law, indicating that he has a basic understanding of the legal issues and procedure.[65]  His submissions are neatly printed and articulate. Other than requesting help with presenting evidence and cross-examining

---

[62]Defendant Carter's Notice of First Supplemental Disclosure, Docket Entry No. 25; Defendant Carter's Notice of Second Supplemental Disclosure, Docket Entry No. 26.

[63]Defendant's MSJ, Docket Entry No. 28, pp. 1, 15 (certificate of service reflecting that the motion and Exhibits A-E were sent to Williams on April 19, 2021).

[64]Plaintiff's MDS, Docket Entry No. 7.

[65]Plaintiff's MSJ, Docket Entry No. 37, pp. 6-8.

witnesses at a potential trial, Williams does not identify any other task that requires the assistance of counsel at this time. Although Williams notes that he has limited access to the library and limited knowledge of the law, this is true of every pro se prisoner and does not, standing alone, constitute an exceptional circumstance. Under these circumstances, Williams's requests for appointment of counsel will be denied.

### III. Motion for Discovery

Williams has filed a Motion to Produce Complete Video Record under Rule 34 of the Federal Rules of Civil Procedure seeking discovery of the following: (1) video from "wing B1 Estelle Unit main [building] dated [January 8, 2019];" (2) the "use of force video" for January 8, 2019; (3) "videos from [the TDCJ Use of Force] Report #M-00214-01-19;" and (4) "any and all appropriate reports to incident."[66] There is no certificate of service attached to this Motion, and there is no indication that Williams served defendant's counsel with a request for discovery, which is typically stayed until after qualified immunity has been decided. See Backe v. LeBlanc, 691 F.3d 645, 648-49 (5th Cir. 2012) (finding that the district court abused its discretion by allowing discovery before ruling on the defense of qualified immunity). Because Williams alleges that this evidence will raise "genuine issues of

---

[66]Motion to Produce Complete Video Record, Docket Entry No. 42, pp. 1-2.

material facts,"[67] the court construes this request as a motion for a continuance to conduct discovery under Rule 56(d)(2) of the Federal Rules of Civil Procedure.

Motions to suspend summary judgment for discovery purposes are "broadly favored and should be liberally granted" because Rule 56(d)(2), formerly codified as Rule 56(f), is designed to "safeguard non-moving parties from summary judgment motions that they cannot adequately oppose." Culwell v. City of Fort Worth, 468 F.3d 868, 871 (5th Cir. 2006). Nevertheless, to obtain a continuance the movant must demonstrate to the court "specifically how the requested discovery pertains to the pending motion," Wichita Falls Office Associates v. Banc One Corp., 978 F.2d 915, 919 (5th Cir. 1992), by explaining "how the additional discovery will create a genuine issue of material fact." Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1442 (5th Cir. 1993). A party requesting such a continuance "may not simply rely on vague assertions that additional discovery will produce needed, but unspecified facts." Id. (internal quotation marks and citation omitted). The party seeking additional time must "set forth a plausible basis for believing that specified facts, susceptible of collection within a reasonable time frame, probably exist and indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion." American Family

---

[67] Id. at 1.

<u>Life Assurance Co. of Columbus v. Biles</u>, 714 F.3d 887, 894 (5th Cir. 2013) (per curiam) (internal quotation marks and citations omitted).

The record reflects that the defendant has already provided Williams with a copy of the Use of Force Report for the incident that occurred on January 8, 2019, as well as medical records, grievances, and reports associated with the disciplinary proceedings against him, which are attached as Exhibits A through E to Defendant's MSJ. Williams does not indicate what other records might be available or what they might show.

The record further reflects that the use of force by Sergeant Carter was not captured on video. According to the officers who responded to Sergeant Carter and Officer Price's calls for help, they were unable to begin recording the incident because Williams was actively resisting when they arrived.[68] Williams acknowledges in his pleadings that his altercation with Sergeant Carter occurred in his cell where no cameras were present and that other officers did not arrive until after he fled from his cell onto the run, where he was promptly subdued.[69] There is no video in the record and the Use of Force Report states that the video camera, which did not begin recording until after Williams was placed in restraints,

---

[68]Use of Force Report, Exhibit C to Defendant's MSJ, Docket Entry No. 28-3, pp. 26-27, 29 (Statements of Officer Symone Powell and Sergeant Anthony Williams).

[69]Complaint, Docket Entry No. 1, p. 4; Plaintiff's MDS, Docket Entry No. 7, p. 1.

malfunctioned.[70] Williams does not show that video of the use of force by Sergeant Carter is available. To the extent that there was any other video footage of what transpired outside of Williams's cell after the use of force by Sergeant Carter had already occurred, Williams does not allege specific facts about what that video would have shown or how this evidence would raise a genuine issue of material fact in connection with his claim against Sergeant Carter. Accordingly, Williams's motion for a continuance to conduct discovery will be denied.

## IV.  Motions for Summary Judgment

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Under this rule a reviewing court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2021); see also Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986). A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2510 (1986). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. Id.

In deciding a summary judgment motion, the reviewing court must view all facts and inferences in the light most favorable to

_____

[70]Use of Force Report, Exhibit C to Defendant's MSJ, Docket Entry No. 28-3, p. 29 (Statement of Sergeant Anthony Williams).

the non-movant and resolve all factual disputes in his favor.  See Shah v. VHS San Antonio Partners, L.L.C., 985 F.3d 450, 453 (5th Cir. 2021).  If the movant demonstrates an "absence of evidentiary support in the record for the nonmovant's case," the burden shifts to the nonmovant to "come forward with specific facts showing that there is a genuine issue for trial."  Sanchez v. Young County, Texas, 866 F.3d 274, 279 (5th Cir. 2017) (citing Cuadra v. Houston Indep. Sch. Dist., 626 F.3d 808, 812 (5th Cir. 2010)).  The non-movant cannot avoid summary judgment by resting on his pleadings or presenting "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation."  Jones v. Lowndes County, Mississippi, 678 F.3d 344, 348 (5th Cir. 2012) (citation and internal quotation marks omitted); see also Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (a non-movant cannot demonstrate a genuine issue of material fact with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence).

The plaintiff represents himself in this case.  Courts are required to give a pro se litigant's contentions a liberal construction.  See Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007) (per curiam) (citation omitted); see also Haines v. Kerner, 92 S. Ct. 594, 595-96 (1972) (per curiam) (noting that allegations in a pro se complaint, however inartfully pleaded, are held to less stringent standards than formal pleadings drafted by lawyers).

-18-

Although the plaintiff represents himself, a pro se litigant is not excused from meeting his burden of proof of specifically referring to evidence in the summary judgment record and setting forth facts showing that there is a genuine issue of material fact remaining for trial. See Outley v. Luke & Associates, Inc., 840 F.3d 212, 217 (5th Cir. 2016); see also Bookman v. Shubzda, 945 F. Supp. 999, 1004 (N.D. Tex. 1996) (citing Forsyth v. Barr, 19 F.3d 1527, 1537 (5th Cir. 1994) (citation omitted)). The court has no obligation under Rule 56 "to sift through the record in search of evidence to support a party's opposition to summary judgment." Adams v. Travelers Indemnity Co. of Connecticut, 465 F.3d 156, 164 (5th Cir. 2006) (quotation omitted).

## V.  Discussion

### A.  Eleventh Amendment Immunity

Sergeant Carter contends that he is entitled to immunity under the Eleventh Amendment from Williams's claim against him in his official capacity as an employee of TDCJ, which is an agency of the State of Texas.[71] See Tex. Gov't Code § 493.001 et seq. Unless expressly waived, the Eleventh Amendment bars an action in federal court by a citizen of a state against his or her own state, including a state agency. See Will v. Michigan Dep't of State Police, 109 S. Ct. 2304, 2309 (1989). The Eleventh Amendment also

---

[71]Defendant's MSJ, Docket Entry No. 28, p. 5.

bars a federal action for monetary damages against state officials when the state itself is the real party in interest. <u>See Pennhurst State School & Hospital v. Halderman</u>, 104 S. Ct. 900, 908-09 (1984). A suit against a state official in his or her official capacity is considered a suit against the state itself. <u>See</u> <u>Will</u>, 109 S. Ct. at 2312 ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the state itself." (internal citations omitted)).

Texas has not waived its Eleventh Amendment immunity and Congress did not abrogate that immunity when it enacted 42 U.S.C. § 1983. <u>See</u> <u>NiGen Biotech, L.L.C. v. Paxton</u>, 804 F.3d 389, 394 (5th Cir. 2015) (citing <u>Quern v. Jordan</u>, 99 S. Ct. 1139, 1145 (1979)). Because TDCJ is a state agency, Sergeant Carter is entitled to immunity from any claim for monetary damages against him in his official capacity as a TDCJ employee. <u>See Loya v. Texas Dep't of Corrections</u>, 878 F.2d 860, 861 (5th Cir. 1989) (per curiam) ("[TDCJ]'s entitlement to immunity under the [E]leventh [A]mendment is clearly established in this circuit."); <u>Oliver v. Scott</u>, 276 F.3d 736, 742 (5th Cir. 2001) ("[T]he Eleventh Amendment bars recovering § 1983 money damages from TDCJ officers in their official capacity."). As a result, Williams's claim against Sergeant Carter in his official capacity will be dismissed.

-20-

## B.   Qualified Immunity

Sergeant Carter has also asserted qualified immunity from liability for Williams's claim of excessive force, which seeks monetary damages from Carter in his individual or personal capacity.[72] "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 102 S. Ct. 2727, 2738 (1982)). "'[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken.'" Messerschmidt v. Millender, 132 S. Ct. 1235, 1245 (2012) (quoting Anderson v. Creighton, 107 S. Ct. 3034, 3038 (1987) (citation omitted)).

"[A] good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." Ratliff v. Aransas County, Texas, 948 F.3d 281, 287 (5th Cir. 2020) (internal quotation marks and citation omitted). "The plaintiff must show that (1) 'the officer violated a federal statutory or

---

[72]Defendant's MSJ, Docket Entry No. 28, pp. 5-14.

constitutional right' and (2) 'the unlawfulness of the conduct was clearly established at the time.'" McCoy v. Alamu, 950 F.3d 226, 230 (5th Cir. 2020) (quoting Rich v. Palko, 920 F.3d 288, 294 (5th Cir.), cert. denied, 140 S. Ct. 388 (2019)).  A plaintiff seeking to meet this burden at the summary-judgment stage "may not rest on mere allegations or unsubstantiated assertions but must point to specific evidence in the record demonstrating a material fact issue concerning each element of his claim." Mitchell v. Mills, 895 F.3d 365, 370 (5th Cir. 2018) (citations omitted).  Williams does not meet his burden to overcome qualified immunity in this instance because, as discussed below, he does not establish that Sergeant Carter violated his constitutional rights under the Eighth Amendment standard that governs claims of excessive force.

## C.   Eighth Amendment Claims of Excessive Force

Williams's claim that excessive force was used against him is governed by the Eighth Amendment, which prohibits cruel and unusual punishment, i.e., the "unnecessary and wanton infliction of pain." Wilson v. Seiter, 111 S. Ct. 2321, 2323 (1991) (quoting Estelle v. Gamble, 97 S. Ct. 285, 291 (1976)).   It is well established that "the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." Wilkins v. Gaddy, 130 S. Ct. 1174, 1176 (2010) (per curiam) (quoting Hudson v. McMillian, 112 S. Ct. 995, 997 (1992)).  However, not every malevolent touch by a prison

-22-

guard gives rise to a constitutional violation under the Eighth Amendment.   See Hudson, 112 S. Ct. at 1000 (citing Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.")).   Because officers may be required to use force when confronted with a prison disturbance, courts are required to afford "wide-ranging deference" to the execution of "policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."   Id. at 999 (internal quotation marks and citations omitted).   When excessive force is alleged in this context, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."   Id.

Whether force used in the correctional setting is excessive under the Eighth Amendment standard depends on "the detention facility official's subjective intent to punish."   Cowart v. Erwin, 837 F.3d 444, 452 (5th Cir. 2016) (quoting Valencia v. Wiggins, 981 F.2d 1440, 1449 (5th Cir 1993)).   Intent is evaluated by reference to the following factors outlined by the Supreme Court in Hudson (the "Hudson factors"):   (1) the extent of the injury suffered, (2) the need for the application of force, (3) the relationship between the need and the amount of force used, (4) the threat reasonably perceived by the responsible officials, and (5) any

-23-

efforts made to temper the severity of a forceful response.  <u>See</u> <u>Hudson,</u> 112 S. Ct. at 999; <u>see also Perez v. Collier,</u> — F. App'x —, 2021 WL 4095263, at *2 (5th Cir. Sept. 8, 2021) (listing the "well-known <u>Hudson</u> factors") (citation omitted).  When conducting this fact-intensive inquiry, the evidence is viewed in the light most favorable to the plaintiff.  <u>See McCoy,</u> 950 F.3d at 230.

### 1.   <u>Extent of the Injury Suffered</u>

The extent of injury suffered by an inmate "may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation, 'or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur."  <u>Hudson,</u> 112 S. Ct. at 999 (quoting <u>Whitley v. Albers,</u> 106 S. Ct. 1078, 1085 (1986)).  The extent of injury may also provide "some indication of the amount of force applied."  <u>Wilkins,</u> 130 S. Ct. at 1178.

It is undisputed that Williams suffered an injury to his right eye as a result of the use of force by Sergeant Carter, who admits punching Williams once in the face with a closed fist.  The medical records, which are summarized above, reflect that Williams was evaluated at St. Joseph's Hospital the day after the use of force occurred, where a CT scan and other tests ruled out anything more serious than a swollen, black eye, with redness and some diminished vision.  Williams was discharged and returned to the Estelle Unit the same day after receiving some eye drops and over-the-counter

pain medication. Two weeks after the altercation with Sergeant Carter, Williams's complaints of diminished vision were evaluated by a specialist in ophthalmology at the John Sealy Hospital, who determined that no acute intervention or treatment was needed. The physician noted that Williams's vision had improved at a subsequent follow-up visit one month later. Williams's injury and the attendant loss of vision were temporary, and there is no evidence showing that he requested or received any further treatment for his right eye.

Williams has alleged that Sergeant Carter pinned him to the wall of his cell and struck him 7 or 8 times in the right eye with a closed fist before spraying chemical agent directly in his eyes.[73] However, this account is not supported by the medical records from St. Joseph's Hospital,[74] and his subsequent evaluation by the ophthalmologist at the John Sealy Hospital,[75] which show that his injury was limited to a black eye and temporarily blurred vision that did not require treatment beyond eye drops. Although a court must draw inferences in favor of the non-movant, particularly when qualified immunity has been asserted, see Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014), "if record evidence clearly contradicts

---

[73]Plaintiff's MDS, Docket Entry No. 7, p. 1.

[74]CAT Scan Reports, Exhibit B to Defendant's MSJ, Docket Entry No. 28-2, pp. 100-01; St. Joseph's Hospital Emergency Record, Exhibit B to Defendant's MSJ, Docket Entry No. 28-2, pp. 107-13, 115.

[75]CMHC Return from Medical Appointment, Exhibit B to Defendant's MSJ, Docket Entry No. 28-2, pp. 80-82.

the plaintiff's allegations, a court 'should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" Waddleton v. Rodriquez, 750 F. App'x 248, 253-54 (5th Cir. 2018) (per curiam) (quoting Scott v. Harris, 127 S. Ct. 1769, 1776 (2007)).   Viewing the medical records in the light most favorable to Williams, the extent of the injury that he sustained does not support his contention that Sergeant Carter used excessive force of a sort that is "repugnant to the conscience of mankind" or in violation of the Eighth Amendment.   See Hudson, 112 S. Ct. at 1000 (citations omitted); see also Waddleton, 750 F. App'x at 255 ("Injury alone does not equate to excessive force.").

### 2.   The Need for Force

Williams acknowledges that Sergeant Carter used force after he disobeyed repeated orders to turn over a cell phone, which is a prohibited item in a correctional facility.[76]   As noted above, Williams explains that he ignored Sergeant Carter's orders to surrender the cell phone because he had been instructed to conduct a master cleanse by erasing its data if he were caught with it.[77] Nevertheless, Williams argues that the force was unnecessary because Sergeant Carter should have continued to "negotiate" while waiting for other officers to arrive.[78]

---

[76]Plaintiff's MDS, Docket Entry No. 7, p. 1.

[77]Id.

[78]Plaintiff's MSJ, Docket Entry No. 37, p. 7.

-26-

Courts have recognized that some degree of force is justified "'in a good-faith effort to maintain or restore discipline' where a prisoner refuses to cooperate with legitimate directives of an official." Velazquez v. Baker, Civil Action No. 5:20-CV-078-BQ, 2021 WL 812505, at *5 (N.D. Tex. Jan. 28, 2021) (citing Gonzales v. Rowe, No. 5:20-CV-052-BQ, 2020 WL 4811005, at *3 (N.D. Tex. July 27, 2020) (finding "some degree of force" by officers was justified where inmate "refus[ed] to comply with the Officers' repeated orders to lie on the cell's floor" because "[d]isobeying orders poses a threat to the order and security of an institution") (citing Minix v. Blevins, Civil Action No. 6:06cv306, 2007 WL 1217883, at *24 (E.D. Tex. Apr. 23, 2007)); Rios v. McBain, No. Civ.A. 504CV84, 2005 WL 1026192, at *7 (E.D. Tex. Apr. 28, 2005) (noting that "open defiance of orders plainly poses a threat to the security of the institution, regardless of whether or not the defiance is emanating from within a locked cell"), R. & R. adopted by 2005 WL 1026192 (E.D. Tex. Apr. 28, 2005)).

Preserving institutional order and discipline is a central objective of sound prison administration. See Bell v. Wolfish, 99 S. Ct. 1861, 1878 (1979) ("[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees."). In recognition of the fact that force may be necessary to preserve order in the face of a prison disruption, the central inquiry when

considering an Eighth Amendment excessive-force claim is whether force was "applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Wilkins, 130 S. Ct. at 1178 (quoting Hudson, 112 S. Ct. at 999).

By his own admission the use of force was prompted by Williams's refusal to obey repeated orders while tampering with evidence that was a serious breach of security. Viewed in the light most favorable to Williams, the record shows that the force was employed to gain Williams's compliance as part of a good-faith effort to restore order, rather than by a subjective intent to inflict harm. See Jones v. Anderson, 721 F. App'x 333, 335-36 (5th Cir. 2018) (per curiam) (concluding that a correctional officer did not employ excessive force when subduing an inmate who "repeatedly refused to obey [the officer's] orders and acted agitated and argumentative"); Hamer v. Jones, 364 F. App'x 119, 124 (5th Cir. 2010) (per curiam) (finding no excessive force where it was undisputed that the plaintiff created a disturbance and that the force used against him was in response to that disturbance); Davis v. Cannon, 91 F. App'x 327, 329 (5th Cir. 2004) (per curiam) (finding no Eighth Amendment violation for excessive force where a prisoner was sprayed with chemical agent and forcefully thrown on the ground after "repeated refusal to obey" an officer's orders).

   3.   Relationship Between the Need for Force and the Amount
   "The amount of force that is constitutionally permissible must be judged by the context in which that force is

-28-

deployed." Baldwin v. Stalder, 137 F.3d 836, 840 (5th Cir. 1998)
(quoting Ikerd v. Blair, 101 F.3d 430, 434 (5th Cir. 1996)).
"Whether the prison disturbance is a riot or a lesser disruption,
corrections officers must balance the need 'to maintain or restore
discipline' through force against the risk of injury to inmates."
Hudson, 112 S. Ct. at 998-99. When reviewing this factor, a court
"must keep in mind that prison officials 'may have had to act
quickly and decisively'" when confronted by an unruly inmate.
Baldwin, 137 F.3d at 840 (quoting Valencia, 981 F.2d at 1446).

As discussed further above, Williams admits that Sergeant
Carter used force after he disobeyed repeated orders and actively
resisted efforts to recover the cell phone, which was a prohibited
item. Although Williams alleges that he was repeatedly punched in
the eye, the medical records do not substantiate this claim. Thus,
Williams does not show that the force used by Sergeant Carter was
unrelated to the need or that such force was effected in a manner
that was disproportionate to that need.

### 4. The Threat Reasonably Perceived by Sergeant Carter

Although Williams admits that he disobeyed several orders
while deleting data from the cell phone, he argues that he did not
pose a threat because he did not make "actual physical contact"
with Sergeant Carter.[79] It is undisputed, however, that the orders
in question concerned Williams's refusal to surrender possession of

---

[79]Plaintiff's MSJ, Docket Entry No. 37, p. 7.

a prohibited item.  Sergeant Carter notes that the danger of cell phones in prison is "significant" because inmates can use them to plan an escape, engage in illegal gang activity, arrange violence against correctional staff and other persons outside the prison, and harass their victims.[80]   In support, he cites an incident in which a Texas death row inmate made a threatening call to a state senator using a smuggled cell phone.[81]   In recognition of the risk posed by cell phones to institutional safety and security, it is a felony to possess one in a Texas prison.[82]   See Tex. Penal Code § 38.11(j).

---

[80]Defendant's MSJ, Docket Entry No. 28, p. 10.

[81]Id. at 11 (citing an incident that was reported in the media and described in Tabler v. Stephens, 588 F. App'x 297, 300 (5th Cir. 2014), in which a death row inmate used a smuggled cell phone to call Senator John Whitmire and make threats about his family).

[82]The security threat posed by smuggled cell phones in prison has been well documented.  See Wise, Lindsay, Cell phones are the new file in a cake after device helped inmate escape, Houston Chronicle A1, 2011 WLNR 5312345 (March 17, 2011) (reporting that 791 phones were found in Texas state prisons in 2010 and that one inmate used a smuggled phone to successfully arrange an escape). As a result of the threat to institutional safety and security, cell phones are prohibited in all state and federal prisons in the United States.  See Severson, Kim and Brown, Robbie, Prisoner's most lethal weapon: smart phone, Houston Chronicle A4, 2011 WLNR 113668 (Jan. 3, 2011).  It is also a federal offense to possess a phone or wireless device in a federal prison.  See id.  Due to the magnitude of this problem, TDCJ employs electronic technology to block calls and track contraband phones.  See Texas prisons working to eliminate cell phone use, Corpus Christi-Caller Times, 2013 WLNR 33693122 (March 15, 2013) (outlining measures to block the use of cell phones, which have been used "to plan and coordinate escapes, run illicit businesses and threaten and harass crime victims or authorities").

The Fifth Circuit has recognized that "TDCJ clearly has 'a compelling interest in staunching the flow of contraband into and within its facilities.'" Ali v. Stephens, 822 F.3d 776, 786 (5th Cir. 2016) (quoting Holt v. Hobbs, 135 S. Ct. 853, 863 (2015)). Given the importance of safety and security in the prison setting, any reasonable officer in Sergeant Carter's position would have recognized the threat posed by Williams's possession of a cell phone and by his attempt to erase data to prevent officials from determining how he obtained the prohibited item while in prison. Williams makes no effort to dispute that possessing a cell phone in prison posed a threat to safety and security. As a result, this factor favors a finding that the force employed was a constitutionally permissible effort to maintain institutional security and not with subjective intent to harm.

## 5. Efforts to Temper the Use of Force

Williams argues that Sergeant Carter violated his rights because he did not employ measures outlined in the TDCJ Use of Force Plan by waiting for other officers to arrive or trying to negotiate before using force.[83] However, Williams does not point to a particular provision within this policy or any other authority that states that a correctional officer must stand idly by while an inmate commits a felony offense that poses a threat to institutional security and then do nothing while the inmate

---

[83]Plaintiff's MSJ, Docket Entry No. 37, pp. 6, 7.

proceeds to tamper with evidence of that offense. More importantly, Williams acknowledges that Sergeant Carter issued multiple orders that were disobeyed and that he did summon the assistance of other officers before employing force.[84] That the use of force became necessary before those officers arrived does not negate the fact that efforts to temper or avoid the use of force were undertaken. Other factors, including the limited extent of the injury that Williams sustained, also support an inference that Sergeant Carter tempered the severity of his response.

Considering all of the evidence and inferences in Williams's favor as required on summary judgment, a review of the Hudson factors indicates that Sergeant Carter did not use force with subjective intent to cause harm, but rather that he did so to restore order and discipline in response to a significant threat to institutional security. Even assuming that a constitutional violation occurred, the record does not support a finding that Sergeant Carter's conduct was objectively unreasonable as a matter of law. See Easter v. Powell, 467 F.3d 459, 462 (5th Cir. 2006) (per curiam) (citing Salas v. Carpenter, 980 F.2d 299, 310 (5th Cir. 1992) ("Even if an official's conduct violates a constitutional right, he is entitled to qualified immunity if the conduct was objectively reasonable."). Because Williams does not raise a genuine issue of material fact showing that force was used

---

[84]Plaintiff's MDS, Docket Entry No. 7, p. 1.

-32-

excessively in violation of the Eighth Amendment or that Sergeant Carter's conduct violated a constitutional right, he has not met his burden to overcome Sergeant Carter's entitlement to qualified immunity.   Therefore, Williams's motion for summary judgment will be denied and Sergeant Carter's motion for summary judgment will be granted.

## VI.   Conclusion and Order

Based on the foregoing, the court **ORDERS** as follows:

1.   Defendant's Motion for Summary Judgment filed by Sergeant Gregory Carter (Docket Entry No. 28) is **GRANTED**.

2.   All of the motions filed by Plaintiff Shawn Lee Williams (Docket Entry Nos. 32, 36, 37, 39, 40, 42) are **DENIED**.

3.   This civil action will be dismissed with prejudice.

**The Clerk is directed to provide a copy of this Memorandum Opinion and Order to the parties of record.**

**SIGNED** at Houston, Texas, on this 17th day of September, 2021.

_____
SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE